NAOMI CHUNG (CSBN 283743)
Law Offices of Naomi Chung
Pier 9, Suite 100
San Francisco, CA  94111
Telephone:  (415) 746-9080
Facsimile:  (415) 484-7054
NaomiChung@defenseaid.com

Attorney for Defendant
OSCAR MADRIGAL JR.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| UNITED STATES OF AMERICA, | Case No. 18-CR-00356-003-EJD |
|---|---|
| Plaintiff, | |
| v. | **NOTICE OF MOTION AND MOTION FOR COMPASSIONATE RELEASE TO HOME CONFINEMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| OSCAR MADRIGAL JR., | |
| Defendant. | Court: Hon. Edward J. Davila<br>Hearing Date:  To be set<br>Hearing Time:  To be set |

**TO: DAVID ANDERSON, UNITED STATEDS ATTORNEY, AND JOHN BOSTIC, ASSISTANT UNITED STATES ATTORNEY**

PLEASE TAKE NOTICE that, at a date and time convenient to the Court for a telephonic hearing, defendant OSCAR MADRIGAL JR., through undersigned counsel, will and hereby does move this Court for an order granting his immediate release from custody and adding an additional term of four months of home detention to his supervised release.  This motion is made on the grounds that Mr. Madrigal suffers from severe obesity and hypertension that places him at high risk of a severe infection should he contract COVID-19, and that compassionate release to home confinement is permitted and appropriate under the circumstances.

This request is made pursuant to the Fifth Amendment to the United States Constitution;

18 U.S.C. § 3582(c)(1)(A)(i), the attached memorandum of points and authorities, the accompanying declarations and exhibits, the pleadings and records on file in this matter, and upon such evidence and argument as may be presented prior to and at the hearing on this motion. Due to the urgency of this request Mr. Madrigal requests a hearing at the earliest date available to the Court and the parties.

DATED: June 2, 2020                    Respectfully Submitted,

                                                                                    */s/ Naomi Chung*
                                                                                     NAOMI CHUNG
                                                                                     Attorney for Oscar Madrigal Jr.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

The defendant, Oscar Madrigal Jr., through undersigned counsel, hereby files this Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), to reduce his 12 months and one day total sentence to time served, and amend the conditions of his supervised release to include four months of home detention.

Mr. Madrigal is only 24 years old, but already suffers from severe obesity and hypertension which places him at high risk of severe illness if infected with COVID-19, and yet he remains at Santa Rita Jail where there is an outbreak of COVID-19 cases.  Mr. Madrigal's current release date is October 17, 2020 according to the Bureau of Prisons (hereafter "BOP") inmate locator website, so granting this request would save Mr. Madrigal from spending an additional four and a half months at increased risk of contracting the COVID-19 virus.

Mr. Madrigal submits he has exhausted the available administrative remedies for his compassionate release request to the BOP, as he is at a private facility and therefore the BOP will not consider his request.  As a result, Mr. Madrigal respectfully requests that the Court reduce his sentence to permit compassionate release with a strict condition of home confinement or other such restrictions as the Court deems appropriate.

**II.   FACTUAL AND PROCEDURAL BACKGROUND**

Oscar Madrigal Jr. pled guilty to the sale of a firearm and ammunition to a felon in violation of 18 U.S.C. §§ 922(d)(1), and on February 3, 2020, the Court sentenced Mr. Madrigal to 12 months and one day in custody and three years of supervised release.  Dkt No. 112.  Months later he remains at the Santa Rita Jail in Alameda County, California, still awaiting transfer to a federal facility to serve the remainder of his sentence.  Mr. Madrigal has served approximately six months in custody, and according to the BOP inmate locator website his release date is October

17, 2020.[1]

On April 30, 2020, defense counsel submitted a request for compassionate release to the Federal BOP. Chung Decl. at ¶ 2. On May 5, 2020, defense counsel emailed another compassionate release request to the Western Regional Counsel's office of the BOP. *Id*. The next day, counsel received a letter of denial stating that "[b]ecause Mr. Madrigal is not in BOP custody, BOP cannot evaluate him for compassionate release and will not be seeking a motion for compassionate release on his behalf at this time." Exhibit 1 – BOP Denial Letter dated May 6, 2020; Chung Decl. at ¶ 2.

Mr. Madrigal has informed counsel that he has no history of disciplinary issues in custody and that, upon release, he intends to reside at his friend's house in San Jose. Chung Decl. at ¶ 3. Defense counsel provided U.S Probation with the information necessary to verify the viability of Mr. Madrigal's release plan. Chung Decl. at ¶ 4.

### III. LEGAL STANDARD

Under the First Step Act, courts may reduce a previously-imposed sentence where "extraordinary and compelling reasons warrant such a reduction and where the defendant has fully exhausted all administrative rights to seek release through the Bureau of Prisons. 18 U.S.C. § 3852(c). In determining whether release is warranted, courts are to consider the factors set forth in section 3553(a) to the extend that they are applicable." *Id*. Sentence reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." *Id*.

### IV. ARGUMENT

Mr. Madrigal asks this Court to grant his compassionate release request, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), by reducing his 12 months and one day sentence to time served, and amend the conditions of his supervised release to instead include four months home detention.

---

[1] Federal Bureau of Prisons, http://www.bop..gov/inmateloc/.

The COVID-19 pandemic and Mr. Madrigal's severe obesity and hypertension constitute extraordinary and compelling reasons to reduce his sentence.

### A. Mr. Madrigal Has Exhausted His Administrative Remedies

Mr. Madrigal's motion is properly before this Court pursuant to 18 U.S.C. § 3582(c)(1)(A) because he exhausted his administrative remedies for compassionate release. In 2018 Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, § 3582(c)(1)(A)(i), now permits this Court to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier[.]"[2]

Mr. Madrigal is in limbo, awaiting a transfer to a BOP facility that is delayed and is unlikely to occur before his release date of October 17, 2020. Due to the BOP's announcement that "inmate internal movement is suspended with limited exceptions", Mr. Madrigal is unable to reach a federal facility where a warden could consider a compassionate release request.[3] Even so, Mr. Madrigal submitted a request for compassionate release to the BOP since the state warden of Santa Rita Jail has no authority to release a federal detainee. On May 6, 2020, defense counsel received a letter informing counsel that,

> The Federal Bureau of Prisons (BOP) is in receipt of your correspondence seeking a compassionate release for your client, Oscar Madrigal Jr. (Federal register no. 25152-111). As you are aware, Mr. Madrigal remains in the custody of the

---

[2] Congress specifically noted the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts." *Id*. (emphasis in original).

[3] Federal Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (accessed on May 29, 2020).

> United States Marshals Service at a private facility. Because Mr. Madrigal is not in BOP custody, BOP cannot evaluate him for compassionate release and will not be seeking a motion for compassionate release on his behalf at this time.

Exhibit 1. This language is identical to the language examined in *United States v. Hernandez*, 18 Cr. 834-04 (PAE), (S.D.N.Y. April 2, 2020), where the district court held that such a denial letter constituted exhaustion of the defendant's administrative remedies within the BOP with respect to compassionate release. Exhibit 2 – Hernandez Opinion & Order at pg. 3. Thus, Mr. Madrigal has shown there is no available remedy from the BOP, and this Court can consider this motion now.

### B. The COVID-19 Pandemic and Madrigal's Health Conditions Constitute Extraordinary and Compelling Reasons For Release

On February 3, 2020, when the Court sentenced Mr. Madrigal, the impact of the COVID-19 pandemic was not fully known and appreciated by the parties. Mr. Madrigal was in custody at Santa Rita Jail at the time of his sentencing, and it was expected that he would be transferred to a federal facility shortly after his sentencing to serve out the remainder of his sentence, perhaps at Lompoc or another federal camp that would afford educational and therapeutic programs that Mr. Madrigal could benefit from. Exhibit 3 – Sentencing Transcript at 17:22-25; 18:1-10. Since then, the world has drastically changed due to the COVID-19 pandemic. Now, there are a reported 6,057,853 million COVID-19 cases worldwide, and in the United States, there are a reported 1,787,680 million cases with 104,396 deaths.[4]

Jail and prison populations are vulnerable to COVID-19 infections because close living quarters and group meal outings make social distancing nearly impossible. Indeed, the federal BOP reports that as of May 31, 2020, there have been 5,234 federal inmates and 612 BOP staff

---

[4] *See* World Health Organization, Coronavirus disease (COVID-19) pandemic, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited June 1, 2020); *see also* Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 1, 2020.

who have tested positive for COVID-19 nationwide.[5] This does not include inmates being held in privately managed prisons. *Id*. For instance, as of May 13, 2020, the federal facility in Lompoc "confirmed 912 open cases among inmates and 25 cases among staff" which is the largest outbreak in any federal prison in the United States.[6] These troubling numbers do not include recent mass testing at USP Lompoc, which is separate from FCI Lompoc. *Id*. Unsurprisingly, on May 16, 2020, the American Civil Liberties Union Foundation of Southern California, the Prison Law Office, and the law firm Bird Marella filed a class action lawsuit was filed against the Federal Prison in Lompoc for the "mismanaging" of the COVID-19 outbreak.[7]

The federal government has also recognized the risks posed to inmates and staff by the COVID-19 pandemic. In a memorandum dated March 26, 2020, Attorney General Barr urged the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic. Exhibit 4 – Barr Memorandum. In response, the BOP has placed an "additional 3,392 inmates on home confinement; an increase of 199 percent."[8]

Mr. Madrigal is in a similar, if not greater risk, at Santa Rita Jail. Santa Rita is a "mega jail" with an inmate population of 1,815 as of May 29, 2020. As Magistrate Judge Nathaniel Cousins pointed out in a recent decision, "This 'mega jail' is the third largest facility in California and the fifth largest in the nation. It houses inmates in all classification levels including federal detainees. Over 29,000 inmates are booked into Santa Rita each year." *Babu et al v. Ahern et al.*, Case No. 18-cv-07677-NC, CR 335 at pgs. 3-5 (internal citations omitted). And Santa Rita Jail could face catastrophic levels of infections seen at other large jails across the country. Even

---

[5] Federal Bureau of Prisons, *COVID-19*, https://www.bop.gov/coronavirus/ (accessed June 1, 2020).
[6] Tyler Hayden, *Lompoc Prison Explodes with Active COVID-19 Cases* (May 13, 2020) at https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/
[7] Megan Healy, *Class action lawsuit filed against Lompoc Federal Prison for 'mismanaging' COVID-19 outbreak* (May 17, 2020), at https://www.ksby.com/news/coronavirus/class-action-lawsuit-filed-against-lompoc-federal-prison-for-mismanaging-covid-19-outbreak
[8] http://www.bop.gov/coronavirus/ (accessed on May 28, 2020).

7

worse, Judge Cousins also found that because of the conditions at Santa Rita Jail,

> Full compliance with CDC recommendations-frequent handwashing, avoiding close contact with other people, cleaning and disinfecting frequently touched items and surfaces as much as possible, and avoiding groups of more than 10 people-is not possible there. The necessarily close quarters and limited hygienic options for inmates of the Jail increases their risk of infection, which in turn risks the well being of jail staff, their families, and the general community.

CR 335 at pg. 7. Accordingly, Magistrate Cousins concluded that "the unprecedented, extremely serious health risk posed by continued jail detention constitutes a compelling reason for temporary release under 18 U.S.C. § 3142(i), *where an alternative custodial residence has been identified.*" *Id*. (emphasis added).

      Mr. Madrigal has made arrangements for alternative custodial residence in San Jose at the home of his friend Ramon Garcia where he would be able to serve out the remainder of his sentence on home confinement while maintaining social distance from others and with better access to hygienic supplies and medical care. Chung Decl. at ¶¶ 3-4. In contrast, Mr. Madrigal's continued detention at Santa Rita Jail deprives him of any realistic opportunity to maintain the "social distance" that over 300 million fellow citizens are being asked to do by government officials. Mr. Madrigal's confinement in an environment long associated with high transmission of infectious disease and with limited access to health care raises a grave risk to his health that now outweighs the government's interest in detaining him at Santa Rita Jail, particularly when a suitable and safer alternative is available.

      Furthermore, attached to this motion is the Declaration of Dr. Brie Williams, Professor of Medicine at the University of California, San Francisco. Dr. Williams has extensive experience studying the medical conditions of vulnerable populations, in particularly the incarcerated and elderly. Williams Decl. at ¶ 3. According to Dr. Williams, the risk of infection and accelerated transmission of COVID-19 within jails is extraordinarily high because correctional officers and healthcare workers enter these facilities daily. *Id*. at ¶ 5. In addition, jails are admitting new

inmates who are coming from communities where COVID-19 infection is rampant and social distancing within jails is nearly impossible. *Id*. at ¶¶ 6-7. Dr. Williams concludes that jails "are fundamentally ill-equipped to handle a pandemic." *Id*. at ¶ 17. Their medical treatment capacity is not at the same level as in a hospital. *Id*. at ¶ 17. In general, even jails that have healthcare centers can only treat relatively mild types of respiratory problems for a very limited number of people. *Id*. at ¶ 18.

That Santa Rita Jail is unable to handle the pandemic is not only apparent but circumstances appear to be getting worse—a dozen more inmates tested positive for COVID-19 at Santa Rita Jail[9] earlier this month resulting in a total of 56 cases of COVID-19 among inmates, with 3 staff members also contracting the virus.[10] Moreover, as of May 30, 2020, Mr. Madrigal's housing unit has been placed under quarantine due to COVID-19 for the *second time this month* which is expected to be lifted on June 11, 2020.[11] These horrific yet revealing statistics were not known to the Court or the parties back on February 3, 2020 when Mr. Madrigal was sentenced.

The Court was also unaware that Mr. Madrigal suffers from severe obesity and hypertension rendering him particularly vulnerable to health-related problems and illness, such as COVID-19. Despite his young age, Mr. Madrigal is not safe at Santa Rita Jail. According to Dr. Williams, even detainees who are neither elderly nor have a preexisting condition are at grave risk. As she explains, people ranging from 18 to 44 years old have accounted for 46 percent of positive tests. Williams Decl. at ¶ 11. This holds particularly true for Mr. Madrigal because he suffers from severe obesity and hypertension. When Mr. Madrigal was first taken into custody in

---

[9] Darwin BondGraham, *How Safe is Santa Rita Jail under COVID-19? Inmates and the sheriff paint very different pictures*, (May 12, 2020), at https://www.berkeleyside.com/2020/05/12/how-safe-is-santa-rita-jail-under-covid-19-inmates-and-the-sheriff-paint-very-different-pictures.
[10] Alameda County Sheriff's Office, https://www.alamedacountysheriff.org/admin_covid19.php (accessed on May 29, 2020).

this case at Santa Rita Jail, medical staff noted several "high risk findings", specifically a "*Pulse of 110 or greater; *Systolic BP of 180 or greater *Diastolic BP of 100 or greater; *Temp of 100.0 or greater *SP02 of less than 90 *Respirations of less than 12/min or greater than 24/min." Exhibit 5 - Santa Rita Jail Medical Records at pg. 3. In addition, according to records from Santa Rita Jail, Mr. Madrigal is 6 feet tall, weighs 289 pounds and has a BMI of 39.2. *See* Exhibit 5 at pg. 1. However, as of May 25, 2020, Mr. Madrigal weighed 292 pounds with a BMI of 39.6. Chung Decl. at ¶ 3. According to the CDC, "people of **any age** who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19" which includes those who suffer from severe obesity.[12] CDC explains that

> [s]evere obesity increases the risk of a serious breathing problem called acute respiratory distress syndrome (ARDS), which is a major complication of COVID-19 and can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients. People living with severe obesity can have multiple serious chronic diseases and underlying health conditions that can increase the risk of severe illness from COVID-19.[13]

Furthermore, recent studies found that younger patients that suffer from obesity are considered at high risk of severe illness from COVID-19. For example, Dr. Jennifer Lighter, a hospital epidemiologist who works at New York University Langone Health and Anna Stachel, assistant director of the Department of Infection Prevention and Control at NYU Langone Health, did a study of 3,615 patients under the age of 60 who tested positive for COVID-19.[14] They found that while body weight did not significantly raise the risk of hospitalization or more severe illness for

---

[11] *Id.* (as of May 30, 2020).

[12] Centers for Disease and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#severe-obesity (accessed on May 31, 2020) (emphasis added).

[13] Centers for Disease and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#severe-obesity (accessed on May 31, 2020) (emphasis added).

[14] Jennifer Clopton, *Obesity New Risk Factor for Young COVID Patients*, WebMD Health News (April 29, 2020) at https://www.webmd.com/lung/news/20200429/obesity-new-risk-factors-for-young-covid-patients.

people over 60, "it did in patients younger than 60, compared to those with a healthy body mass index, which is less than 30." *Id*. Specifically, the study showed that,

- Patients with a BMI of 30-34 were twice as likely to get admitted to the hospital or to be admitted to acute care.

- Patients with a BMI of 35 or higher were **twice as likely to be admitted to the hospital** and **three times as likely to end up in the intensive care unit**.

*Id*. (emphasis added). Mr. Madrigal is under the age of 60 and suffers from a BMI of 39.6 which according to the data above, would render him twice as likely to be admitted to the hospital and three times more likely to end up in the ICU.

Dr. Lighter's research inspired Dr. Leonardo Seoane, the chief academic officer, senior vice president, and pulmonary critical care doctor at Ochsner Health in New Orleans to work with the Ochsner Center for Outcomes and Health Services Research team to study 3,000 patients who tested positive for COVID-19 in his hospital system. And Dr. Seoane "found that 59% of the hospitalized patients were obese with an average BMI of 33" and "obesity nearly doubled the chances that patients with COVID-19 would end up in the ICU." *Id*.

Similarly, physicians working at the Johns Hopkins Hospital published an article discussing the correlation between COVID-19 and obesity in younger patients. They explained that "as the pandemic hit the Johns Hopkins Hospital in late March 2020, younger patients began to be admitted to our ICU, many of whom were also obese. [15] An informal survey of colleagues directing ICUs at other hospitals around the country yielded similar findings. As a result, they examined the correlation between BMI and age in patients with COVID-19 admitted to ICU at university hospitals at Johns Hopkins, University of Cincinnati, New York University, University of Washington Florida Health, and University of Pennsylvania. The results were as follows:

> In our dataset of 265 patients . . . we found a significant inverse correlation

---

[15] *Obesity could shift severe COVID-19 disease to younger ages*, https://www.thelancet.com/pdfs/journals/lancet/PIIS0140-6736(20)31024-2.pdf (April 30, 2020).

11

> between age and BMI, in which younger individuals admitted to hospital were more likely to be obese []. . . .
>
> Obesity can restrict ventilation by impeding diaphragm excursion, impairs immune responses to viral infection, is pro-inflammatory, and induces diabetes and oxidant stress to adversely affect cardiovascular function. We conclude that in populations with a high prevalence of obesity, COVID-19 will affect younger populations more than previously reported. Public messaging to younger adults, reducing the threshold for virus testing in obese individuals, and maintain greater vigilance for this at-risk population should reduce the prevalence of severe COVID-19 disease.[16]

Dr. Seoane echoed a similar warning to the public -

> I think early on, a lot of Americans thought it was just the elderly that were at high risk. So I think **it's important that people understand that if they or a loved one is obese, that makes them high-risk, too, and they need to take extra precautions to make sure they don't contract the virus**.

*Id*. (emphasis added). Unlike most Americans, however, Mr. Madrigal remains at Santa Rita Jail unable to take even the basic precaution of social distancing.[17]

Even more concerning is that Mr. Madrigal also suffers from hypertension, and according to the CDC, while hypertension alone does not place someone in the high-risk group, hypertension coupled with "other medical conditions like obesity . . . place[s] [people] at higher risk of severe illness from COVID-19."[18] And according to the American College of Cardiology and the American Heart Association, hypertension is defined as blood pressure at or above 130/80 mm Hg, with Stage 1 defined as at or above 130/80 and Stage 2 defined as at or above 140/90.[19] It is unclear whether Mr. Madrigal suffers from Stage 1 or Stage 2 hypertension, but he undeniably suffers from hypertension. In October of 2018, Mr. Madrigal's blood pressure was dangerously high—he had a "[s]ystolic BP of 180 or greater" and a "[d]iastolic BP of 110 or

---

[16] *Id.*
[17] Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#severe-obesity (accessed on May 31, 2020).
[18] Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#COVID-19-and-Hypertension (accessed on May 31, 2020).
[19] Centers for Disease Control and Prevention, https://www.cdc.gov/bloodpressure/facts.htm (accessed on May 31, 2020).

greater". Exhibit 5 at pg. 2. More recently, on May 25 of this year, Mr. Madrigal's blood pressure was 130/80 mm Hg, which is better than it was in 2018, but nonetheless too high. Chung Decl. at ¶ 3.

Despite his young age, Mr. Madrigal's severe obesity and hypertension render him uniquely susceptible to serious and potentially fatal complications of COVID-19. Santa Rita Jail cannot contain the spread of COVID-19 in its facilities, and it cannot protect vulnerable inmates like Mr. Madrigal. Under these circumstances, there are "extraordinary and compelling reasons" to order Mr. Madrigal's immediate release rather than forcing him to serve out the four and a half months remaining on his sentence under threat of his health and life. *See*, *e.g.*, *United States v. Perez*, CR 17-513 AT, Dkt No. 98 (S.D.N.Y Apr. 1, 2020) (defendant's "medical condition, combined with the limited time remaining on his prison sentence and the high risk in the MDC posed by COVID-19," justified release); *United States v. Rodriguez*, CR 03-0271 AB, Dkt No. 135 (E.D.Pa. Apr. 1, 2020) ("the outbreak of COVID-19 and underlying medical conditions that place [defendant] at a high risk should he contract the disease" justified release); *United States v. Foster*, 1:14-cr-324-02 (M.D. Pa. Apr. 3, 2020) (finding "no rationale is more compelling or extraordinary" than the "high likelihood of contracting COVID-19 from which he would not be expected to recover").

### C. Compassionate Release is Consistent with Sentencing Commission Policy Statements and § 3553(a) Factors

Section 3582 directs the Court to consider applicable Sentencing Commission policy statements as well as the sentencing factors under § 3553(a) in determining whether to exercise its authority to reduce a sentence. The applicable policy statement provides that "extraordinary and compelling reasons" exist where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."

USSG § 1B1.13, Application Note 1(A).  That is the case with Mr. Madrigal given his heightened risk to COVID-19: he suffers from severe obesity and hypertension which substantially diminishes his ability to protect against potentially fatal complications should he become infected with the virus while in custody.

The section 3553(a) factors similarly weigh in favor of release.  At the outset, § 3553(a)(2)(D) requires the Court to consider the health of a defendant.  Granting Mr. Madrigal compassionate release to a sentence of home confinement will permit him to take advantage of medical care he may require without delay or hindrance and allow him to take the necessary precautions of social distancing and sanitizing his environment.

Compassionate release is also consistent with the Guidelines' goal of just punishment.  Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-conviction developments under § 3553(a).  Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risks it presents.  This Court initially granted a variance when first sentencing Mr. Madrigal, and he is grateful for that reduction.  Absent the COVID-19 pandemic Mr. Madrigal would not be asking for this reduction, but just punishment does not warrant a sentence that includes exposure to a life-threatening illness.  In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody.  *Helling v. McKinney,* 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding situations).  Given that the risk of COVID-19 was not known to the Court back in February, it now forms the basis for a further reduction in Mr. Madrigal's sentence.  Furthermore, Mr. Madrigal would be required to serve 4 months in home confinement and compliance with any

additional restrictions that the Court finds to be appropriate in these circumstances.  As Judge Engelmayer pointed out in *United States v. Hernandez*, "the conditions of Mr. Hernandez's forthcoming home confinement will meaningfully restrict his freedom of movement during the next four months."  Exhibit 2 at pg. 7.

   Lastly, compassionate release will not create an unmanageable risk of danger to the public.  In fact, the broader community is safer with Mr. Madrigal socially distancing and sheltered at his friend's home, than with him exposed to COVID-19 at Santa Rita Jail.  In addition, Mr. Madrigal has no history of violence and instead all his criminal history prior to this case are misdemeanors for drug possession.  PSR ¶¶ 32-34.  The Court also recognized that upon reviewing Mr. Madrigal's record he "appear[s] to be a nonviolent individual".  Exhibit 5 at 18:4-6.  Moreover, Mr. Madrigal is deeply remorseful for his actions as he expressed at his sentencing hearing:

> My choices have cause me embarrassment and incarceration, as well as taught me ma[ny] things I might not have learned if not for this experience.  For example, owning up to my mistakes, seeking and accepting help, also being honest with myself, my family and friends.
>
> I am extremely grateful that my poor judgment never resulted in anyone getting injured or worse.  I had not considered the consequences due to my state of mind at the time, which I hope – in which I hope never to resort to ever again.
>
> I hope to be a positive role model to all my younger siblings and make my entire family proud of me.  I strive to be a productive member to society.
>
> I genuinely apologize and also give thanks to the court, my family and loved ones, for helping me move my life in a bright new direction.

Exhibit 5 at 10:23-25; 11:1-13.  It is also worth noting that Mr. Madrigal's regrettable decision to sell a firearm to a felon in this case was driven by a combination of factors, including the influence of bad peers and the lack of positive support he had from his family and true friends.  Since then, Mr. Madrigal has steered clear from bad peers and instead surrounded himself with loving family members and good friends who are committed to helping Mr. Madrigal stay on the

path of rehabilitation.  This was evident at Mr. Madrigal's sentencing hearing when the Court stated, "my sense is that these family members who are here, they know I'm going to sentence you, they know that, but they are here to support you, and they will continue to support you throughout your life and you continue to make them proud."  Exhibit 5 at 19:17-11.  This case has been a rude awakening for Mr. Madrigal, and he is devoted to turning his life around.

**V.   CONCLUSION**

      For the reasons stated, Oscar Madrigal Jr. respectfully requests that the Court order his immediate release from Santa Rita Jail and amend his supervised release to include an additional period of home confinement.

DATED:  June 2, 2020                           Respectfully Submitted,

                                                          */s/ Naomi Chung*
                                                          NAOMI CHUNG
                                                          Attorney for Oscar Madrigal Jr.